## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GERARD DJATE** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) **1:07CV00100 (EGS)** |
| | ) |
| **v.** | ) **Judge E.G. Sullivan** |
| | ) |
| **THE DISTRICT OF COLUMBIA**, *et al.* | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT DISTRICT OF COLUMBIA'S FIRST AMENDED MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

Plaintiff Gerard Djate ("Plaintiff"), *Pro Se,* hereby respectfully files this Opposition

to Defendant District of Columbia's First Amended Motion to Dismiss and/or Motion for

Summary Judgment ("Opposition"). In support of his Opposition, Plaintiff refers this

Court to the attached Memorandum of Points and Authorities.

Dated:  June 5, 2007                           Respectfully submitted,

Gerard Djate, *Pro Se*
2330 Good Hope Rd S.E., #1222
Washington, DC 20020
(202) 460-0097/ 678-5941

**RECEIVED**

JUN - 6 2007

NANCY MAYER WHITTINGTON. CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GERARD DJATE**                                )
                                                )
    **Plaintiff**                              )
                                                ) **1:07CV00100 (EGS)**
                                                )
v.                                              ) **Judge E.G. Sullivan**
                                                )
**THE DISTRICT OF COLUMBIA, *et al.***          )
                                                )
    **Defendants.**                            )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT DISTRICT OF COLUMBIA'S FIRST AMENDED MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Plaintiff Gerard ("the Plaintiff"), *Pro Se* and in support of its motion avers as follows:

### I.    Preliminary Statement

On April 26, 2007, Darlene Fields, designated employee authorized to receive service of process on behalf of the Attorney General for the District of Columbia, has been duly served with the Summons, Complaint, and Jury Demand in the above entitled case. *See* Court Record and Exhibit 1.

On April 26, 2007, Tabatha Brazton, designated employee authorized to receive service of process on behalf of the Mayor for the District of Columbia, has been duly served with the Summons, Complaint, and Jury Demand in the above entitled case. *See* Court Record and Exhibit 2.

Defendant District of Columbia has attached Exhibit A in support of its First Amended Motion to Dismiss and/or Motion for Summary Judgment where it knew that

the designated exhibit is woefully incomplete since the relevant pages are missing.

Defendant District of Columbia has attached Exhibit E in support of its First Amended Motion to Dismiss and/or Motion for Summary Judgment where it knew that the designated exhibit is woefully incomplete since Plaintiff's written statement entitled "Statement of Gerard Djate on Assault Events January 20, 2006" together with photographs were requested and made part of the Police Report. *See* Complaint, ¶ 49, and Exhibit 4.

At the present time, Plaintiff cannot present necessary evidence in the form of eyewitnesses' exhibits and others to refute certain positions taken and contentions made in Defendant's Motion because of inadequate discovery.

Plaintiff's Complaint is brought, not only under the Civil Rights Acts, but directly under the Constitution.

Plaintiff realleges all the factual allegations of his Complaint and incorporates these herein. *See* Complaint, ¶ ¶ 1-78.

## II . Argument

### A. Plaintiff Cured Any Claimed Defects of Service of Process on Defendant District of Columbia

Because as of April 26, 2007, Darlene Fields, designated employee authorized to receive service of process on behalf of the Attorney General for the District of Columbia on one hand, and Tabatha Brazton, designated employee authorized to receive service of process on behalf of the Mayor for the District of Columbia on the other hand, have both been duly served with the Summons, Complaint, and Jury Demand in the above entitled case, any claimed defects in the service of process of the Defendant District of Columbia

has been cured and it has been properly served. *See* Court Record, Defendant's Exhibits B and C, and Plaintiff's Exhibits 1 and 2.

**B. Because of the Existence of Joint Actions Between Defendant District of Columbia and Hawk One Security Special Police, Plaintiff Can Maintain a Fourth Amendment Claim Against the Defendant District of Columbia**

When individuals are not employees of the government, the under-color-of-law inquiry focuses on the connection between the challenged action and the government. The question becomes whether there is a sufficient link between the private individual and the government. The U.S. Supreme Court has articulated four related standards to determine whether there is a sufficient connection between the individuals and the government such that the action by the individuals nevertheless constitutes action by the government, i.e., when a defendant is not a government employee, but is somehow linked to the government, courts must question whether there was joint action, an intertwined relationship, state encouragement, or a public function performed. *See Martin A. Schwartz & John E. Kirklin, 1A Section 1983 Litigation: Claims & Defenses,* §5.10, at 520 (3rd ed. 1997).

It is well established that government employees or contractors who exercise professional judgment during the course of their employment act under color of law. Although the assertion of independent judgment may appear to suggest autonomy, professionals such as prison physicians, special police officers, exercise that judgment on behalf of the government, in furtherance of the goals of the government. *See West v. Atkins,* 487 U.S. 42, 49-50 (1988); *Lugar v. Edmondson Oil co.,* 457 U.S. 922, 935 (1982).

In the standard of joint actions, two common situations have been found to easily

4

suggest actions under color of law. First, a private person who conspires with a government actor for the purpose of the alleged conspiracy. *See Dennis v. Sparks*, 449 U.S. 24, 28 (1980) (holding that private parties who corruptly conspired with a state judge acted "under color of law"). Second, a private person who acts as an agent of the government acts under color of law, even though the person is not a full-time employee of the government, because for purposes of the challenged action, the person functions as if he or she were a full-time employee. *See Adickes v. Kress & Co.,* 398 U.S. 144, 152 (1970).

In the instant case, both situations are present. First, D.C. Code §§ 5-101.03, 5-129.02, 5-129.03, 5-724, the Defendant District of Columbia's policies and customs, and the entire contract between the Defendant District of Columbia and Defendant Hawk One Security Special Police ("Hawk") need to be carefully examined.

Second, Plaintiff visited the DMV pursuant to a renewal notice sent to him by the Defendant District of Columbia DMV advising him, among other things, of the need to visit the DMV for the renewal transaction about the date of the challenged actions. As the facts show, Defendant District of Columbia DMV employees' contacts with Plaintiff involved direct transactions with Plaintiff. *See* Complaint, ¶ ¶ 10-31. Further, the facts developed thus far show that Defendant District of Columbia engaged in affirmative undertaking of protection when it contracted with Hawk as it did and proclaimed Hawk as the one charged to protect those visiting Defendant District of Columbia's government-owned and leased facilities including the DMV building, which affirmative undertaking of protection Plaintiff justifiably relied when making the visit. *See* Defendant Exhibit A, p. 11, ¶ 1.

5

In this case, one needs no exposition in seeing that the Hawk Special Police officers

conspired with the two government employees-actors for the purpose of the alleged

conspiracy. *See* Complaint, ¶ ¶ 18-21, 30-35. Further, it is readily apparent that Hawk

Special Police officers acted as agents of the government, therefore under color of law,

because they functioned as if they were employees of Defendant District of Columbia

and under its direct control.

Additionally, the Hawk Special Police Officers were to exercise and did exercise their

professional judgment during the course of their employment in furtherance of the goals

sought to be attained by Defendant District of Columbia's DMV employees, hence in

furtherance of the goals of that defendant.

### C.  Because of the Existence of Intertwined Relationship Between Defendant District of Columbia and Hawk One Security Special Police, Plaintiff Can Maintain a Fourth Amendment Claim Against the Defendant District of Columbia

In *Burton v Wilmington Parking Authority*, 365 U.S. 715, 722 (1961), the U.S.

Supreme Court held that a private restaurant in a public building was a state actor when it

refused to allow service to African-American. The Court detailed the symbiotic

relationship between the restaurant and the state parking garage. The private restaurant

was an integral part of the public building, not only in serving the public but also in

financing the public parking. Determining whether a private person acted jointly or was

intertwined with a state actor requires analysis of all links between the private person and

the government. Further discovery will be needed for that purpose.

The notwithstanding, it can be said that the instant case is similar to *Burton* in that

there is a symbiotic relationship between Hawk Special Police and Defendant District of

Columbia's government DMV building. Hawk Special Police is an integral part of that

public government building, not only in servicing the public, providing security and

protection, but also in acting pursuant to government police authority such as making

arrests, detaining persons, etc. Further, it appears from the terms and language in the only

pages of the contract submitted as Defendant's Exhibit A that Defendant District of

Columbia has more than a significant measure of control over the Hawk Special police

officers' conduct. Finally as pleaded in the Complaint, Hawk Special Police officers in

concert with Defendant District of Columbia engaged in unlawful discrimination based

on race and national origin by refusing access to DMV services based on race and

national origin.

## D. Because of the Existence of Public Function, Plaintiff Can Maintain a Fourth Amendment Claim Against the Defendant District of Columbia

Government action can be present if the private person is performing a function that is

"the exclusive prerogative of the State". *See Jackson v. Metropolitan Edison Co.,* 419

U.S. 345, 353 (1974). Only the following activities have been held by the Courts as not

being public functions: operating a shopping mall, providing utilities services, educating

troubled children, housing, mass transportation, legal services, providing healthcare, and

supporting nursing-home care. *See Hudgens v. NLRB* 424 U.S. 507, 520-21 (1976) *,*

*Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 358-59 (1974), *Rendell-Baker v.*

*Kohln* 457 u.s. 830, 840-43 (1982)*, Blum v. Yaretsky,* 457 U.S. 991 (1982)*.*

Thus, the question whether government action is present requires detailed analysis of

the facts of each case. The government-action inquiry not only must explore the links

between the private actors and the government, but also must assess the significance of

each tie and the cumulative effect of the ties. Hence this inquiry invites courts to

determine "where the governmental sphere ends and the private sphere begins". *See*

*Edmonson v. Leesville Concrete Co.,* 500 U.S. 614 620 (1991). Further discovery will be needed for that purpose.

That notwithstanding, the evidence so far adduced in the instant case shows that government action exists because Hawk Special Police officers were charged with the performance of inherent and traditional public functions – preserving the public peace, preventing crime and arresting offenders, protecting the rights of persons and property, protecting persons in government buildings, enforcing laws – that are the exclusive prerogatives of a government. *See* D.C. Code §5-101.03.

**E. Because of the Government-Created Danger, Plaintiff Can Maintain a Fourth Amendment Claim Against the Defendant District of Columbia**

If a state or government creates the danger confronting the individual, it may then have a corresponding duty to protect. *See Pinder v. Johnson,* 54 F.3d 1177 (4th Cir. 1995) (en banc) ( observing that "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive"); *Seamons v. Snow,* 84 F.3d 1226 (10th Cir. 1996) (noting that "[i]n addition to the 'special relationship' doctrine, we have held that state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm"); *Reed v. Gardner,* 986 F.2d 1122, 1126-27 (7th Cir. 1993) (holding that "plaintiffs . . . may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been . . .); *Freeman v. Fergusson,* 911 F.2d 52,55 (8th Cir. 1990) (noting "[*DeShaney]* analysis establishes the possibility that a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's

danger of or vulnerability to, such violence beyond the level it would have been at absent

state action); *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 359 (11th Cir. 1989)

(holding that were the defendants had put the plaintiff, [ . . .], in a "unique position of

danger" by causing inmates who were inadequately supervised to be present in the town

hall, then "under the special danger approach as well as the special relationship approach

. . . the defendants owed [the plaintiff] a duty to protect from the harm they created");

*Estate of Stevens v. City of Green Bay,* 105 F.3d 1169, 1177 (7th Cir. 1997).

As mentioned *supra,* Plaintiff visited the DMV for the renewal transaction after being

notified by the Defendant District of Columbia DMV to do so. The evidence shows that

once there, Defendant's own errors and misdirections led to the unfortunate events.

Further, Defendant knew that there has been some public outcry about its decision to

continue employing Hawk Special Police notwithstanding the facts of its financial woes

and delinquencies, the poor/inadequate training of its officers, the violent propensity of

some of its officers, the poor criminal background investigations of its officers, other

incidents of violent crimes engaged in by its officers, etc. *See* Exhibit 3.

The totality of the evidence adduced thus far reveals that Defendant District of

Columbia, through its official 'policy or usage', created, or substantiality contributed to

the creation of, a danger and rendered Plaintiff more vulnerable to that danger than

Plaintiff would otherwise have been. It follows that Defendant District of Columbia

therefore had a duty to protect Plaintiff – something it failed to do. Here again, further

discovery would be needed to fully establish all those facts.

### F.  Because Defendant Official Policy, Custom, and/or Usage Was the Moving Force Behind Plaintiff's Injury, Plaintiff Can Maintain a Fourth Amendment Claim Against the Defendant District of Columbia

*Monell* allows the imposition of government liability not only when the challenged conduct executes or implements a formally adopted policy, but also when that conduct reflects "practices of state officials so permanent and well settled as to constitute a 'custom or usage' with the force of law". *See Monell v. Department of Social Services,* 436 U.S. 658, 691 (1978); *Bouman v. Block,* 940 F.2d 1211 (9th Cir. 1991); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981) (vote of City Council to cancel license for rock concert was official decision for *Monell* purpose); *Owen v. City of Independence,* 445 U.S. 622 (1980) (personnel decision made by City Council constitutes official city policy). It is noteworthy that in both *Owen* and *Fact Concerts,* decisions officially adopted by the government body itself need not have general or recurring application in order to constitute official "policy".

So, liability is attributed to the municipality in custom-type cases through a policymaker's actual or constructive knowledge of and acquiescence in the unconstitutional custom or practice. *See McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 511 (7th Cir. 1993) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice"). Acts of omission as well as commission, may serve as the predicate for finding of unconstitutional policy or custom. *See Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (holding that "[t]he decision not to take any action to alleviate the problem of detecting missed arraignments constitutes a policy for purposes of § 1983 municipal liability").

Here, with the limited evidence adduced thus far, it is undisputed that because the Defendant District of Columbia's 2-year contract with Hawk was more than

10

$14,000.000.00, the Mayor, the Office of Corporation Counsel, and ultimately, the

Council of the District of Columbia have all reviewed it and approved it. Further, when a

flow of negative and damaging information about both Hawk and the 2-year contract

surfaced, the Council of the District of Columbia as the city's governing body had a

further review but ultimately decided to uphold that contract. *See* D.C. Code § 2-301.05d,

Exhibit 3. It goes without saying the City Council's decision to uphold that contract and

that agency in the face of serious irregularities and negative information about Hawk was

official policy, custom, and/or usage for *Monell* purposes, and hence for purposes of §

1983 municipal liability.

Further, that official policy, custom, and/or usage is indeed the moving force behind

Plaintiff's injury through the government-created danger.

### G. **Plaintiff More Than Sufficiently Satisfied the Notice Requirement Pursuant to D.C. Official Code § 12-309**

In order for a police report made in the regular course of duty to satisfy the section 309

requirement of notice, it must contain information as to the approximate time, place,

cause, and circumstances of the injury or damage " . . . with at least the same degree of

specificity required of a written notice." *See Jenkins v. District of Columbia,* D.C.App.,

379 A.2d 1177, 1178 (1977); *Rieser v. District of Columbia,* 563 F.2d 462, 476 (1977). A

"determination of whether a particular police report or series of reports constitutes

statutory notice to the District of Columbia can only be reached after consideration of the

particular facts of the case, the nature of the report itself and the objectives sought to be

attained by the notice provision." *See Pitts v. District of Columbia,* 391 A.2d 803, 808-09

(1978).

It is undisputed that the police report correctly indicated the time, place, cause, and

circumstances of the injury. Further, although Defendant District of Columbia intentionally omitted to submit the complete police report to this Court in its exhibit E, this Court should take note that shortly thereafter the conduct complained of, the Metropolitan Police Department ("MPD") First District acquired a witness' written statement from Plaintiff regarding the circumstances of the injury he sustained entitled "Statement of Gerard Djate on Assault Events January 20, 2006", in addition to photographs of the injury, and copy of Plaintiff's letter to the then-MPD Chief Charles Ramsey and all of which wwere made part of the police report. Further, a copy of the same "Statement of Gerard Djate on Assault Events January 20, 2006" was hand-delivered personally by Plaintiff to the DMV director and Vice-Director on or about January 24, 2006. *See* Complaint, ¶¶48-50, and Exhibit 5.

Thus, as in *Rieser,* and in *James v. District of Columbia,* 610 F.Supp. 1027 (1985), the complete police report provided Defendant District of Columbia notice of all the principal facts sufficient to lead it to those related facts which were peculiarly within its possession, e.g., the video monitoring of the place of the events and injury complained of as represented by the responding MPD officers – the "smoking gun" videotape that has never been heard of since, the identified witnesses, etc. It is telling that as in *Rieser*, Defendant District of Columbia does not contend at all that it was deprived of an opportunity to investigate the matter further where, indeed, the box "investigate further" was initially checked as per the MPD's supervisor recommendations on the police report but no further investigation was undertaken despite Plaintiff's entreaties. Further, there is simply no statutory requirement that Plaintiff give notice of intent to sue.

WHEREFORE, all premises considered, Plaintiff respectfully prays that this Honorable

Court deny Defendant District of Columbia's Amended Motion to Dismiss and/or for

Summary Judgment.


Dated:   June 5, 2007                                     Respectfully submitted,


                                                          Gerard Djate, *Pro Se*
                                                          2330 Good Hope Rd S.E., #1222
                                                          Washington, DC 20020
                                                          (202) 460-0097/ 678-5941


## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on the 6th day of June 2007, a copy of the foregoing
Plaintiff's Opposition to Defendant District of Columbia's First Amended Motion to
Dismiss and/or Motion for Summary Judgment was mailed, postage prepaid, to
Defendant District of Columbia, through its attorney of record Rachel R. Hranitzky,
Esquire to the following address: Rachel R. Hranitzky, Esq., Assistant Attorney General
for the District of Columbia, 441 Fourth Street, N.W., Sixth Floor North, Washington,
DC 20001.


                                                          Gerard Djate, *Pro Se*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GERARD DJATE** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) **1:07CV00100 (EGS)** |
| | ) |
| **v.** | ) **Judge E.G. Sullivan** |
| | ) |
| **THE DISTRICT OF COLUMBIA,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Comes now the Plaintiff and in support of his Opposition to Defendant District of
Columbia's Motion for Summary Judgment herein submits his Statement of Material
Facts in Dispute:

1. Hawk One Security Special Police operates under the supervision of the
Metropolitan Police Department ("MPD").

2. On or about January 30, 2006, the MPD First District acquired a witness' written
statement from Plaintiff regarding the circumstances of the injuries he sustained entitled
"Statement of Gerard Djate on Assault Events January 20, 2006" in addition to
photographs of the injury, and copy of Plaintiff's letter to the then-MPD Chief Charles
Ramsey and all of which were made part of the police report.

3. A copy of the same "Statement of Gerard Djate on Assault Events January 20,
2006" was hand-delivered personally by Plaintiff to the DMV director and Vice-Director
on or about January 24, 2006.

4. Hawk One Special Police officers Tim Delyons and Donte A. Slate acted as alleged
in the Complaint.

16

5.    All the DMV personnel acted and failed to act as alleged in the Complaint.

6.    All named officers of the MPD-1rst District acted and failed to act as alleged in the Complaint.

7.    The scene of occurrences was under video monitoring at all relevant times.

8.    Plaintiff reentered the building primarily to retrieve all his personal effects that were caused to be left behind by Hawk One Special Police officers Tim Delyons and Donte A. Slate.

9.    The Council of the District of Columbia, and the mayor knew or should have known of the increased danger posed by the inadequate training and supervision of Hawk One Special Police officers Tim Delyons and Donte A. Slate at the DMV building.

10.    The Council of the District of Columbia, and the mayor through their official policy, custom, and usage made Plaintiff more vulnerable to the assaults, battery, etc. complained of by Plaintiff.

11.    Plaintiff visited the DMV as he did by following the instructions contained in the notice he had received from the DMV.

12.    Any other relevant and material facts as pleaded by the Plaintiff that are disputed by Defendant District of Columbia.


Dated:   June 5, 2007                          Respectfully submitted,


                                                Gerard Djate, *Pro Se*
                                                2330 Good Hope Rd S.E., #1222
                                                Washington, DC 20020
                                                (202) 460-0097/ 678-5941


17

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GERARD DJATE** | ) |
| | ) |
|     **Plaintiff** | ) |
| | ) **1:07CV00100 (EGS)** |
| | ) |
| **v.** | ) **Judge E.G. Sullivan** |
| | ) |
| **THE DISTRICT OF COLUMBIA,** *et al.* | ) |
| | ) |
|     **Defendants.** | ) |

## AFFIDAVIT OF GERARD DJATE

I, Gerard Djate, being duly sworn, state as follow to the best of my knowledge:

1. I am a witness in this case, over the age of 18, and competent to testify.

2. I affirm all the facts as pleaded in my filed Complaint and any other pleadings filed in this Court in connection with this action.

3. I am unable to provide any other affidavits from eyewitnesses and record evidence in support of relevant and material facts essential to fully justify my opposition to Defendant District of Columbia' Summary Judgment Motion because of difficulties in reaching the direct eyewitnesses and in obtaining record evidence from Defendant District of Columbia at this time.


Gerard Djate

District of Columbia: SS

SUBSCRIBED AND SWORN TO before me this ⟋⟍ day of June 2007.

Notary Public

My commission expires:

Kirston Fleming
NOTARY PUBLIC
DISTRICT OF COLUMBIA
My Commission Expires October 31, 2011

19

# Exhibit 1

# AFFIDAVIT OF PROCESS SERVER

**United States District Court**

**District Of Columbia**

RECEIVED
MAY - 2 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**Gerard Djate**

    Plaintiff

vs.

**The District of Columbia, et al**

    Defendant

Attorney:

Gerard Djate
2330 Good Hope Rd., SE, #1222
Washington, DC. 20020

**Case Number:** 1:07CV00100

Legal documents received by Same Day Process Service on April 26th, 2007 at 1:00 PM to be served upon **District of Columbia, Office of Corporation Counsel at 441 4th St., NW, 6th Flr., Washington, DC. 20001**

I, Brandon A. Snesko, swear and affirm that on **April 26th, 2007 at 4:50 PM,** I did the following:

Served a **Government Agency** by delivering a conformed copy of this **Summons in a Civil Case; Complaint and Jury Demand,** to Darlene Fields **as Registered Agent for Washington, DC** of the within named agency, to wit: **District of Columbia** and informing that person of the contents of the documents.

**Description of Person Accepting Service:**
Sex: Female   Age: 40   Height: 5'6   Weight: 170   Skin Color: Black   Hair Color: Black   Glasses: Y

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury under the laws of the that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

_____
**Brandon A. Snesko**
Process Server

**Same Day Process Service**
**1322 Maryland Ave., NE**
**Washington, DC 20002**

**(202) 398-4200**

Internal Job ID: 0000002831

Copyright © 2005-2007 Process Server Central, LLC. All rights reserved.

# Exhibit 2

# AFFIDAVIT OF PROCESS SERVER

## United States District Court

### District Of Columbia

RECEIVED MAY - 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Gerard Djate

    Plaintiff

vs.

The District of Columbia, et al

    Defendant

Attorney:

Gerard Djate
2330 Good Hope Rd., SE, #1222
Washington, DC. 20020

Case Number: 1:07CV00100

Legal documents received by Same Day Process Service on April 26th, 2007 at 1:00 PM to be served upon Mayor of the District of Columbia, Adrian M. Fenty or his designee by serving Tabatha Braxton at 1350 Pennsylvania Ave., NW, Washington, DC. 20004

I, Brandon A. Snesko, swear and affirm that on April 26th, 2007 at 4:30 PM, I did the following:

Served a Government Agency by delivering a conformed copy of this Summons in a Civil Case; Complaint and Jury Demand, to Tabatha Braxton as Staff Assistant of the within named agency, to wit: Mayor of the District of Columbia and informing that person of the contents of the documents.

**Description of Person Accepting Service:**
Sex: Female  Age: 30  Height: 5'4  Weight: 150  Skin Color: Black  Hair Color: Black  Glasses: N

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury under the laws of the that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

_____
**Brandon A. Snesko**
Process Server

**Same Day Process Service**
1322 Maryland Ave., NE
Washington, DC 20002

(202) 398-4200

Internal Job ID: 0000002830

Copyright © 2005-2007 Process Server Central, LLC. All rights reserved.

# Exhibit 3

**WTOP** Washington's News, Traffic & Weather    Now On 103.5 FM    LISTEN ONLINE

103.5 FM
820 AM

Home Page > News > Local > Local Stories

December 29th, 2006

# Special Officer Wanted on Prior Domestic Charge

Jul 12th - 3:22pm

Neal Augenstein, WTOP Radio

WASHINGTON -- A special police officer -- charged with two armed robberies in Georgetown Friday -- was wanted on a different charge before he was hired to protect city government buildings.

WTOP Radio has learned there was a warrant for Xavier Brooks on a domestic assault charge before the night he allegedly used his .38 caliber gun to rob two people in the 2800-block of Dumbarton Street in Northwest.

So why was Brooks carrying a gun, wearing a badge and protecting D.C. buildings when there was a warrant for his arrest? His employer, Hawk One Security, says it was unaware of the warrant when it hired Brooks one month ago.

The company says D.C. Police never provided any information about the warrant, but the company acknowledges it could have done its own separate background check.

Lieutenant Jon Shelton, of the licensing branch of Metropolitan Police Department would not comment on this particular case. He says, in general, a special police officer goes through a thorough background check yearly. If a commissioned SPO is arrested, he is required to notify his employer and MPD, and police immediately revoke the license, pending the investigation.

Hawk One and police officials acknowledge it is possible that Brooks was never aware of the outstanding warrant.

Police say Brooks used his service revolver to demand a man's wallet while his co-defendant pointed a gun at a woman and took her purse.

After the crime, police put out a lookout and arrested both men during a traffic stop.

They were stopped at a traffic light on M Street, NW, at 30th Street. The arresting officer says "the defendant and co-defendant were breathing very heavy and sweating," according to the charges.

When Brooks handed over his identification that said he was a special police officer, the officer asked him whether he was armed and he replied that he was.

The charges say police found the service revolver in a black nylon bag on the floor of the vehicle.

They also found the co-defendant's gun.

As a special police officer, Brooks had the authority under D.C. law to make arrests and to take his service weapon home.

Hawk One tells WTOP that Brooks provided security for the D.C. Department of Human Services on New York Avenue in Northeast.

(Copyright 2005 by WTOP Radio. All Rights Reserved.)

< Back

Home | Site Map | Advertise with Us | Contact Us | Privacy Statement | EEO Public File Report

AP material Copyright 2006 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# Metropolitan

## School security remains questionable

By Jim McElhatton
THE WASHINGTON TIMES
July 18, 2006

D.C. public schools, which have endured criticism and scrutiny of their security, continue to struggle with guards fraternizing with students and radios that cannot communicate, community and school leaders say.

Their concerns are being aired on the heels of eight government audits highlighting problems in school security in the past few years and last year's takeover of school security operations by the Metropolitan Police Department.

"It's kind of ridiculous to walk in at 4:30 [p.m.] and see everything wide open," Cathy Reilly, director of the Senior High Alliance of Parents, Principals and Educators, testified Friday during a D.C. Council hearing on school security. "There's nobody there."

Marlene Berlin, a member of Wilson High School's local restructuring team, said the transition of security from the school system to the police department "has not gone very well, frankly."

Security officers "flow in and out of the school" without the principal being notified, and some officers refuse to deploy under the principal's orders, said Miss Berlin, who was testifying on behalf of Principal Stephen P. Tarason.

"Teachers are concerned about the level of fraternization between security officers and students," she said.

Friday's oversight hearing was convened by council members Kathy Patterson, Ward 3 Democrat and chairwoman of the Education, Libraries and Recreation Committee, and Phil Mendelson, at-large Democrat and chairman of the Judiciary Committee.

Assistant Metropolitan Police Chief Gerald Wilson, who oversees school security, said he has not heard any complaints about guards fraternizing with students since the department took over security last year.

"We want the security personnel to be mentors, to get to know the young people," Chief Wilson said. "They're going to have to have some type of cordial conversation. Is that fraternization? I don't know."

Chief Wilson defended his department's role, saying schools now operate in a "safe, stable manner." The hundreds of security guards in the school system are privately employed through D.C.-based Hawk One Security Inc., but the police department supervises them.

Hawk One officials did not testify at the hearing, and the company did not respond to phone messages yesterday.

Copyright © 1999 - 2006 News World Communications, Inc.
http://www.washingtontimes.com/metro/20060717-103555-7726r.htm

Case 1:07-cv-00100-EGS     Document 15-3     Filed 06/06/2007     Page 8 of 29

# Metropolitan

## Schools security contract gets nod

By Jim McElhatton
THE WASHINGTON TIMES
July 7, 2005

A D.C. government panel is allowing Hawk One Security Inc. to begin work on a contract to post guards in the District's public schools while it decides whether to overturn the two-year, $30.3 million award.

The contract was frozen after the outgoing contractor, Watkins Security Agency of DC Inc., filed a legal challenge last month that criticized the bidding process and raised questions about Hawk One's finances.

In a June 27 ruling, the D.C. Contract Appeals Board lifted a temporary stay issued on the contract after the protest was filed.

"There is no allegation that the transition of performance of services ... cannot be made smoothly," the board stated in its three-page ruling.

However, the future of the contract remains uncertain.

The ruling means that Hawk One can take over the schools security contract while the appeals board decides whether to overturn the award and give it back to Watkins Security, according to legal documents.

Watkins officials had asked the board to suspend the Hawk One contract until the board decides on Watkins' protest.

But the board denied the request, saying the contract still could be transferred back to Watkins if it wins its challenge.

"There is no indication that the transition from the awardee [Hawk One] back to the protester [Watkins] would not be handled equally well if the protest is sustained," the board ruled.

In arguing to keep the contract, Watkins officials have said that D.C. officials ignored Hawk One's unpaid income taxes and did not properly handle the bidding process.

Hawk One owes more than $1 million in unpaid taxes to the Internal Revenue Service, according to city records.

However, city officials have said the company's finances should not disqualify it because it recently secured a line of credit worth about $20 million.

Copyright © 1999 - 2005 News World Communications, Inc.
http://www.washingtontimes.com/metro/20050706-100241-5810r.htm

# Metropolitan

## Contract awarded despite tax liens

By Jim McElhatton
THE WASHINGTON TIMES
November 29, 2005

City officials generally have given Hawk One good marks.

Edward D. Reiskin, deputy mayor for public safety and justice, said yesterday that the Metropolitan Police Department "is satisfied with the performance of Hawk One."

Designmark and Hawk One are separate but closely related companies.

They are based in the same offices on H Street in Northwest and on Martin Luther King Avenue in Southeast and share the same top executives, city and court records show.

Patrick McRae is president of Designmark, and Tyrone Thompson serves as its registered agent and vice president, records show.

Mr. Thompson is Hawk One's president, and Mr. McRae has identified himself in a previous interview as the security company's senior executive officer.

In addition, the companies were named in several of the same lawsuits in recent years, including one in which Aetna Healthcare Inc. sued Mr. Thompson under civil provisions of the Racketeer Influenced and Corrupt Organizations (RICO) Act during the late 1990s.

In its lawsuit, the health insurance company said Hawk One was created as a shell entity to obtain cheaper workers' compensation insurance for other, interrelated companies.

Attorneys for Mr. Thompson denied any improper activities, and the lawsuit was settled out of court in 2001.

Mr. Thompson also faces a recent lawsuit filed in D.C. Superior Court by Sherry Drake, who was married to Hawk One's late founder and previous owner, Carthur Drake.

The lawsuit states that Hawk One officials intentionally left open some IRS tax liens because closing out the debts would have triggered a settlement deal, in which officials would have had to hand over cash and property to Mrs. Drake.

However, a former attorney for Mr. Drake has sought to dismiss the complaint, saying the lawsuit stemmed from dissatisfaction over the terms of Mr. Drake's estate.

Copyright © 1999 - 2005 News World Communications, Inc.
http://www.washingtontimes.com/metro/20051128-101536-3298r.htm

# Metropolitan

## Security firm challenges loss of D.C. schools contract

By Jim McElhatton
THE WASHINGTON TIMES
June 10, 2005

The District's $15.1 million contract award to Hawk One Security Inc. to post guards in city schools has been temporarily halted, after a legal challenge from the outgoing contractor that questions Hawk One's finances and the contract selection process.

The D.C. Contract Appeals Board notified officials in the Office of Contracting and Procurement of the protest yesterday, citing city regulations that bar a contract from moving forward once a formal appeal has been filed.

Hawk One was set to start work in the schools on July 1 through a $15.1-million-per-year contract that runs through the 2006-07 school year. The company recently began work on a separate $14.2 million contract to guard about 100 city government buildings.

The District has 20 days to respond to the challenge by Watkins Security of D.C. Inc. The appeal cites Hawk One's unpaid federal income taxes and previously undisclosed testimony by top school and police officials in seeking to overturn the contract award.

In a Nov. 18 deposition, the Metropolitan Police Department's deputy chief administrative officer -- Margaret Poethig, who headed the school security contract's evaluation panel -- noted several problems early in the contract selection process.

According to the deposition, Miss Poethig said she confronted Police Chief Charles H. Ramsey about misgivings.

She testified that she told Chief Ramsey "about how incredibly impossible and ridiculous this was and how I was not qualified, nor did I have the resources, nor did I think it was a good idea for numerous reasons to do it this way and please don't make me do it and everything else."

A police spokesman said Chief Ramsey was unavailable for comment yesterday.

In a telephone interview yesterday, Miss Poethig said she did not recall making the statement in her 61-page deposition. She was deposed in connection with a separate, pre-bid protest that Watkins filed last year.

Miss Poethig yesterday said she recently resigned from the police department and is taking a job in the Justice Department, adding that her resignation was not influenced by any concerns over the school system's security contract.

"I think, in the end, we did an excellent job following the procurement process and evaluating the proposals," she said yesterday.

Pam Satterfield, chief of staff for the D.C. Office of the Attorney General, yesterday said officials plan to challenge Watkins' protest. She declined to comment on the case, saying city officials had just received the appeal yesterday.

Copyright ? 1999 - 2005 News World Communications, Inc.
http://www.washingtontimes.com/metro/20050609-105042-1586r.htm

# Metropolitan

## Contract awarded despite tax liens

By Jim McElhatton
THE WASHINGTON TIMES
November 29, 2005

The D.C. government has awarded a no-bid contract to a janitorial business tied up in tax liens worth hundreds of thousands of dollars and linked to the local company that provides security in most city buildings and public schools, government records show.

City officials awarded a $641,000 contract for janitorial services to Designmark Services Inc. on Nov. 1.

The contract, issued on a sole-source basis, was awarded one month after the Internal Revenue Service had filed a tax lien for the second time this year against Designmark.

The IRS' Sept. 1 lien against Designmark showed $88,921 in unpaid taxes during the first quarter of 2005. In March, the IRS filed a lien totaling more than $325,000 for unpaid taxes since 2000, according to documents at the D.C. Office of the Recorder of the Deeds.

Designmark's financial troubles have occurred while city officials and the company's top executives have faced questions about the finances of Hawk One Security Inc., a separate firm that shares the same Northwest address and top executives as Designmark, city records show.

Hawk One began a two-year contract for about $30 million in July to provide hundreds of private guards in D.C. public schools. The company also holds a separate contract worth about $14 million to provide security in dozens of city government buildings.

Contracting officials yesterday said they knew about Designmark's tax problems in August, when the IRS told them about an arrangement for the company to pay its debt.

"The Designmark Inc. contract is a bridge contract issued ... for services to continue until the awarding of a new contract," said Janis Bolt, a spokeswoman for the D.C. Office of Contracting and Procurement.

Neither Hawk One nor Designmark officials returned phone calls yesterday.

Some school officials earlier this year expressed concern about Hawk One's financial stability after complaints from guards about not being paid on time and a background check by the city's contracting office that showed tax liens.

The company has blamed the bounced checks to its employees on an accounting mix-up, saying Hawk One is on solid financial footing.

It also has said its tax liens were incurred under previous management more than a decade ago.

Copyright © 1999 - 2005 News World Communications, Inc.
http://www.washingtontimes.com/metro/20051128-101536-3298r.htm

# Metropolitan

## Security firm challenges loss of D.C. schools contract

By Jim McElhatton
THE WASHINGTON TIMES
June 10, 2005

A spokeswoman for Watkins yesterday said the company wants the Contract Appeals Board to overturn the Hawk One contract.

"They've awarded this contract to a company that is financially unstable at the very least," Watkins spokeswoman Donna Henry said. "It's a reflection to the degree they'll go to prevent fair and competitive bidding."

The school system's security came under scrutiny after a student was fatally shot inside Ballou Senior High School in February 2004. Since then, the D.C. Office of the Inspector General has uncovered failures in the school system's contracting office.

Watkins, which has handled school security since 2003, said in its legal filing that it should retain the contract because Hawk One owes more than $2 million in income taxes, according to a financial background check.

In an interview earlier this week, Hawk One President Tyrone Thompson estimated his company's debt to the Internal Revenue Service at "a little over a million dollars." He said that amount was down from more than $8 million. He told The Washington Times that the debt had been incurred under a previous management.

Mr. Thompson also said his company is financially stable after securing a line of credit of more than $20 million. He said the company will have paid off its debt in three months and is negotiating with the IRS.

He could not be reached for comment yesterday.

School system officials also have expressed concern about Hawk One's finances.

In a May 31 letter to City Administrator Robert C. Bobb, schools Superintendent Clifford B. Janey said he and school board members were alarmed that a background check showed the company at a "high risk of severe payment delinquency over the next 12 months."

Mr. Bobb sent a letter yesterday to Mr. Janey, saying city contracting officials performed financial background checks "in great detail" on Hawk One and its funding corporation.

"I take very seriously the safety of the children of the District of Columbia," Mr. Bobb wrote. "Given all information provided, the award to Hawk One is in the best interest of the District."

D.C. Council member Kathy Patterson, Ward 3 Democrat and chairman of the education committee, defended the Hawk One contract.

"This is one of the most thorough procurements done by the District," she said, adding that the Watkins protest was not a surprise.

Copyright ? 1999 - 2005 News World Communications, Inc.
http://www.washingtontimes.com/metro/20050609-105042-1586r.htm

## Special police officer charged with using Service Weapon to Rob Two People

**DISTRICT OF COLUMBIA, WASHINGTON** - An armed special police officer for the company that protects city government buildings and public schools has been charged with using his service weapon to rob two persons in Georgetown last weekend.

Xavier Brooks, 34, who works for D.C.-based Hawk One Security Inc., and his uncle Antwane Brooks, 33, robbed two persons Saturday in the 2800 block of Dumbarton Street NW, according to the U.S. Attorney's Office.

Both men face three counts of armed robbery and are being held without bond, U.S. attorney spokesman Channing Phillips said.

According to charging documents, Xavier Brooks, who is licensed to carry a weapon for Hawk One, used his black .38-caliber revolver to demand a man's wallet. His uncle pointed a gun at a woman and took her purse.

Police arrested the pair during a traffic stop at M and 30th streets NW. Officers found a service revolver after the traffic stop in a nylon bag on the floor of Xavier Brooks' vehicle, the charging documents state.

The Metropolitan Police Department referred all inquiries about the case to the U.S. Attorney's Office. Hawk One yesterday referred calls to the McCants & Associates law firm in Silver Spring. The law firm did not return calls.

Officials told WTOP Radio yesterday that the security officer's license has been suspended.

According to a review of D.C. Superior Court records, Xavier Brooks has had run-ins with the law. He was charged with simple assault for a domestic incident in February in a case that is pending, records show.

In addition, he was charged in 1992 with having an unregistered gun. That case resulted in a not guilty verdict, according to court records.

Meanwhile, the D.C. Office of Inspector General is expected later this year to issue a report on whether some guards in D.C. public schools had been employed despite having criminal histories.

The report is the seventh in a series of audits that the inspector general has conducted into school security.

Hawk One began its work on the school system's two-year, $30.3 million contract on July 1. However, the previous contractor, Watkins Security Agency of D.C. Inc., is seeking to overturn the award, citing what it calls flaws in the bidding process and concerns over Hawk One's finances.

Hawk One officials have said the company, which recently won a $14.1 million contract to guard city government buildings, is financially stable.

Lt. Jon Shelton, who runs the security officers' management and gun-control branches for D.C. police, would not comment on the arrest. However, in general, he said special police officers can get licenses from the police department only if they have been hired by a security company.

"This is not a city where we issue a carte blanche license and you can work anywhere," he said. "You have to be hired by a company first."

Armed special police officers must be trained by an National Rifle Association-certified teacher, Lt. Shelton said. Any felony convictions and some misdemeanors — including assault and weapons possession — automatically bar an applicant from carrying a firearm, he said.

Yearly background checks are conducted, but the company is responsible for ensuring all applicants' convictions and arrests are listed, he said.

[tags]Bad Cop News, Police, Bad Cop, Bad Cops, Cop, Cops, Officer, Crime, Criminal, Officers, Law Enforcement, Deputy, Deputy Sheriff, Sheriff, Arrest, Arrested, Charged, Charges, Indictment, Indicted, Sentence, Sentenced, WASHINGTON, DISTRICT OF COLUMBIA[/tags]

Appeared: July 13, 2005 :: Bad Cop News, Police, DISTRICT OF COLUMBIA
Comment RSS :: Trackback URI
Previous post »
« Next post

FAIR USE NOTICE: In accordance with Title 17 U.S.C. Section 107, this material is distributed

Then Kills Himself
- Vermont State Police Commander Thomas Powlovich Defends Killing Mentally Ill
- Massachusetts State Trooper Robert Grover and Boston Police Officer edward MacPherson Under Investigation For Brawl Over Directing Traffic Outside FaithHill and Tim McGraw Concert
- Two Veteran Boston Massachusetts Police Officers, Paul Durkin and Josept Behnke, involved in cop-on-cop shooting after night of drinking
- Crazed Van Zandt County Sheriff's Investigator James Finch Shot With Shotgun After Pistol-wipping and Shooting His Ex-Wife, Shooting At Police
- Gage Sheriff's Deputies Suspended In Connection With Cell Phone And Credit Card Misuse
- Republican advertising consultant behind anti-Clinton smear convicted of child molestation
- Veteran Berkeley California Police Officer Cary Kent Gets A Sweet Deal From Alameda County Judge C. Don Clay After Stealing Heroin and Meth From Evidence Locker
- Florence Alabama Police Captain Basil Kenny Stanley Indicted By Federal Grand Jury For Child Pornography
- Investigation Continues After Aspen Colorado Police Officer Melinda Calvano Shoots Homeless Senior Citizen With Taser
- Harvey Illinois 'Problem police' Cause Debate
One Year Ago:
- Man who died after being arrested was shot twice with a Taser, including after he was in custody
- Cops forced to catch and immediately release offenders
- Police Officer and Firefighter Charged in Gas Explosion
- Police Shot Woman with Fake Gun
- Here We Go Again: Police Officers (White) Kill Man with Knife (Black) in New Orleans, Igniting Yet Another Investigation
- Gunfight at the Wal-Mart Corral - Store Employee and Suspect in Robbery Injured
- Deputy Held On $1 Million Bond After Robbery. Investigation into Possible Links to Unsolved Cases in Area.
- Police shoot, kill man after Christmas night standoff
- Off-duty cop charged with threatening motorcyclist with gun after road dispute
- Police Officer Charged with Incest (8 Yr and 7 Yr Old). Search Finds Child Porn, Sex Toy, Weapons, Computer, etc.
- Police: Woman Didn't Swallow Cell Phone Voluntarily
- Not Guilty, Insane - Man who Terrorized National Forest Campground, Pointed Rifle at Police
- Chief of Investigative Division, Charged with Misdemeanor Drunk Driving, Car Got Stuck in Ditch - Oops!
- Police Officer Hits and Kills Pedestrian with Car
- Man With a Screwdriver on Interstate Shot and Killed By a Police Officer

- Meta
  - Login
  - RSS
  - Comments RSS

# July 13, 2005

## Special police officer charged with using Service Weapon to Rob Two People

**DISTRICT OF COLUMBIA, WASHINGTON -** An armed special police officer for the company that protects city government buildings and public schools has been charged with using his service weapon

washingtonpost.com

# Firm's Finances Worry D.C. School Officials

**Security Company Rated 'High Risk' in Report, but Council Members Express Confidence**

By V. Dion Haynes
Washington Post Staff Writer
Tuesday, June 7, 2005; B01

D.C. Board of Education members said yesterday that they are concerned that city officials have awarded a two-year, $30.1 million school security contract to a company that is rated a high risk for bankruptcy and late payments.

They said their concerns about Hawk One Security Inc. are based on a 17-page report prepared by the business information firm Dun & Bradstreet as part of the city's vetting process for bidders on the contract.

On a scale of 1 to 5 that measures the risk that a company will experience "severe financial stress, such as a bankruptcy over the next 12 months," the Dun & Bradstreet report gave Hawk One a score of 5. Similarly, it got a 5 as its credit score, indicating a "high risk of severe payment delinquency over the next 12 months," the report said.

Several city officials, including D.C. Council member Kathy Patterson (D-Ward 3), who chairs the education committee, said that although they were initially alarmed by the report, they have received additional information from Hawk One that has convinced them that the company would be able to fulfill the contract.

The report said the high-risk ratings were based on factors such as bills more than 60 days past due and evidence of liens involving unpaid state and federal taxes.

Several school board members said they are worried about awarding the security contract to a company that could go out of business, citing the threat to student safety if the schools are left without guards.

"I'm concerned the company could do reckless things to stay above the margin," said board Vice President Carolyn N. Graham, who said she and her colleagues learned of the report last week. "We don't want to put children's safety in the hands of a company at risk of going under."

Patterson has invited board members to a meeting today to discuss their concerns.

City officials said they have not encountered any problems with Hawk One's fulfillment of a contract to provide security in D.C. government buildings.

The city paid the company $7.4 million last year, according to D.C. contracting records.

Hawk One President Tyrone Thompson did not return messages left at his office.



The contract with Hawk One stems from the council's decision last year, after a fatal shooting at Ballou Senior High School and complaints about the previous security contractor, to shift authority over school security from the school system to the D.C. police. School board members have been skeptical of that arrangement, saying it will be unwieldy and expensive to have police oversee security while the school system continues to pay for it.

A panel of city, police and school officials recommended Hawk One last month. Because no council member objected during a review period that ended last week, the contract is scheduled to take effect July 1.

However, board members said they are looking into whether they can take action to block its implementation.

Hawk One, a District-based minority-owned company, was founded in 1992, the Dun & Bradstreet report said. The report listed eight tax liens filed against the company in Maryland and the District from 1996 to 2003.

William E. Sharp, chief contracting officer for the police department, said he was satisfied with Hawk One's financial health after the company supplied additional records.

"The tax liens are older and in the process of being resolved," he said.

Patterson said she, too, was reassured when she learned about the additional information. She questioned why school board members did not raise their concerns earlier, noting that a member of the school system's legal team was on the panel that recommended Hawk One.

Alan F. Hauff, a small-business program specialist for the College of Business Administration at the University of Missouri at St. Louis, looked at the Dun & Bradstreet study at a reporter's request. Hauff said that small minority firms working for city governments often encounter credit problems. He said the fact that the company has managed to stay afloat for more than 10 years with 150 employees demonstrates that it is viable.

"Cities are notorious for paying 60 to 90 days late," Hauff said. "He's got a large payroll to foot. . . . If he had a problem meeting the payroll, the government would shut him down. They've not done that."

*Database editor Dan Keating and researcher Bobbye Pratt contributed to this report.*

© 2005 The Washington Post Company

**Ads by Google**

**BlackBerry® Curve™ 8300**
Portable. Stylish. Smart. Style Meets Substance. BlackBerry Curve.
www.BlackBerryCurve.com

# Exhibit 4

**STATEMENT OF GERARD DJATE**
**ON**
**ASSAULT EVENTS**
**January 20, 2006**

1. I arrived at the DMV located on 300 block of C Street NW, Washington, DC , around 3:00 pm for the renewal of my vehicle registration that is due to expire on January 24, 2006. (I had some court filings to do at the Small Claims Court, Probate Court, copying at the Kinko's + mailing of clients' documents at the US Post Office thereafter).

2. After obtaining Ticket No. H 902, I was filling out the paper work while waiting for my number to be called.

3. My number was called shortly while I was still filling out the renewal form, and I was directed to Window No. 1.

4. There, I waited in line for two female customers (first, a Black woman with Ticket No. H 900, then a younger Caucasian woman who let me borrow her pen with Ticket No. 901).

5. When I appeared at the counter for my renewal transaction, the young Black man, employee of the DMV informed me that he could not complete the transaction because the computer system shows some (about 5) outstanding parking tickets. He advised me that the only way to complete my transaction was to go to either Window No. 9 or Window No. 10, where I would be able to resolve the apparent delinquency issue that I was disputing. He indicated to me that it might be just a computer glitch error or else I could make payment arrangements at either of those windows then return back to his for completion of my transaction.

6. I followed his instructions and went to those windows were other customers were being serviced. I realized that people were being called by certain numbers after some time, then one of the window clerk, a young Black female who noticed that I have been waiting for sometime, asked me what I was waiting for. So, I responded by letting her know that I was directed to their windows by one of their colleague from Window No.1 about some disputed parking tickets delinquency issues for resolution prior completion of my transaction.

7. The Window No. 9 clerk then pointed out to me another young Black woman, employee of the DMV, standing at a door entrance, and asked me to go talk to her. While I was yet walking out to the latter, the former called out to the latter and told her that she needed to take care of me.

8. After I finished talking to that one, she asked me to follow her to the room where Window No. 1 was so she could talk to that clerk who in her opinion did not know what he was doing by referring me to Windows No. 9 or 10.

9. I followed her there and in my presence she told that DMV clerk that he should have known better by doing what he did instead of referring me directly to Room 1034 where the Traffic Adjudication OOffice was now located. That clerk humbly apologized and the female clerk went on to show me how to get to the Traffic Adjudication Office, Room 1034. That DMV employee also advised me to be

back before 4:00 pm to complete my transaction because the DMV closes at that time she said.

10. I followed her instructions and arrived there where an older Black woman with very thin hair asked me about the purpose of my visit. After I stated it to her, she gave me Ticket No. 63. Because by then it was about 3:30 pm, I inquired about how long she thought I might have to wait, she answered "20 minutes" at most.

11. While waiting, I heard some other customers complaining about the unnecessary long wait time to get a verification of outstanding tickets through the adjacent Print Out office where many employees were just standing there idly, and chatting, instead of taking care of those customers who were just there to verify issues of outstanding tickets through printout. After I verified those complaints to be accurate by going to that Print Out office, I went to that older Black woman with thin hair to advise her of those legitimate complaints. In response, she accused me of attempting to cut through the waiting line. I rejected her accusations. Because she became irritated and persisted in her accusations, I requested to see a supervisor. She informed me in response that the supervisor of the Traffic Adjudication Office was so busy to see me without even bothering to verify if her representations were accurate before making them. I insisted that I need to see the supervisor. She then went to the next security officer, a somewhat heavy set young Black woman, and told her that I was being disorderly. That security officer in turn, shouted to me in a very commandeering and loud voice from a certain distance "you, you come here!!!" in front of all the waiting customers. I responded "You are the one wanting to see me. So you come here to me". After hearing that reply from me, some of the waiting customers busted out laughing looking at her.

12. I saw that officer talking over her talkie-walkie then walked to me. She asked me to leave. I told her she had no reason to ask me to leave because I wanted to see the supervisor or one of the supervisors of the Traffic Adjudication Office.

13. In turn, that officer said "very well, the supervisor's office is around the corner, you go over there!!!" in the same intimidating and commandeering loud voice falsely referring to her security supervisor's office. When I corrected her that I needed to see, not a security supervisor, but a supervisor for the Traffic Adjudication Office, she became irritated, and while she was yet talking, one of the supervisors I wanted to talk to happened to be passing by; so she stopped and inquired about what was going on. In response, that security officer indicated to her that I wanted to see a supervisor of the Traffic Adjudication Services. Upon hearing that, the latter, another young Black woman stated "that would be me. How can I help you Sir?" turning to me. In few words, I explained the problem, so she said "oh! I can help you with that! Give me your paperwork so I can check for you". I handed it to her and followed her and waited outside her office until she came back to me.

14. That supervisor handed over to me a printout stating "I really don't know what those [DMV] people are talking about. I verified all of our systems and I didn't see anywhere where you have outstanding parking tickets to be paid. Here, take this printout with you and go back to them to show it to them telling them that

there is nothing owing". I received my paperwork back from her in addition to the printout and returned to the DMV where by then it was about 4:10 pm.

15. I returned to Window No. 1 to see the first DMV clerk but he indicated that he could not see me while he was walking away and pointing to yet another young Black woman that I should see.

16. After I explained the series of event taking place, that last DMV clerk asked me to follow her to the reception area where she would ascertain everything for me. While there, she indicated that unless I show some receipts evidencing that I paid the parking tickets showing up in the DMV's computer system, but not showing in that of the Traffic Adjudication Office, the DMV would not complete my transactions notwithstanding what the Traffic Adjudication supervisor said. She later on inquired whether or not I owned a certain vehicle with a certain tag number. After she identified that vehicle for me and I acknowledged ownership, she wrote down that tag number and asked me to return to that supervisor to ask her to specifically check information on that tag number then return to the DMV after I do so.

17. So I returned to the Traffic Adjudication Office and requested to see that supervisor or anyone else who can assist me. There, the new but younger Black woman attendant that replaced the older one with very thin hair, boldly and abruptly told me "you are not going to see anybody. We are closed". I replied by pointing to her (displaying Ticket No. 63) that I had a calling ticket and was directed back to the Print Out office to see the supervisor who assisted me minutes earlier. In reply, she indicated that "we are now at Ticket No. 75 anyway, your ticket shows no. 63. So we can't see you, comeback on Monday!". So, I told her that I wanted to see the supervisor I saw earlier or any other supervisors of the Traffic Adjudication Office. She replied that no supervisor would see me and that if I did not leave immediately, she would call security because I was a troublemaker (she was present when the older employee with very thin hair was making her baseless claims against me). After saying that, that employee/attendant left to go talk to the security officers, now two (2) of them, a young Black male in addition to the female officer with whom I had discussions earlier.

18. Meanwhile I spotted a clerk who earlier was with the supervisor that assisted me earlier coming out of the Print Out office, so I approached her and asked to see her. She politely asked me to give her a minute while she finishes transaction with someone she was coming out to see.

19. While I was waiting, the male security officer came up to me and stated "I want you to leave right now!!!". So I stated "I cannot leave right now because someone is going to see me". So he insisted "Oh no, I'm telling you: leave right now!!!" so, I said "no, I have no reasons to leave right now. I'm here to conduct business transactions". So he said " Ok, I I'm telling you you have no more business here, you are out!!!" and I said "not until that lady clerk sees me". So he said "very well, …", then he laid his hands on me, hitting me, shoveling me, and attempting to get me to hit the floor. I resisted. Not succeeding, he thereafter tackled me from behind and in so doing made my head hit violently the floor. I was successful in getting back up on my feet since I used to practice Judo myself many years ago.

In the course of his assaulting me, he also grabbed me by necktie, pulling on it, in an apparent bid to choke me, etc.....

20. Then a third security officer, another Black male came to join the former in the assault on my person. They hit me with excessive force and brutality in various areas causing me to suffer cuts, bruises, swelling, sprains, etc. they were eventually successful in hitting me through the exit glass doors and throw me out.

21. In the course of these events, they broke my prescription eyes glasses and some of my items of personal property got scattered that they did not permit me to collect.

22. When I saw them back again about 5-10 minutes thereafter, these two security officers refused to identify themselves when I requested they do so. It was only after I identified myself as an attorney to them with the right of disclosure of their identities and one who appears to be their supervisor came up to intervene, that they finally but reluctantly disclosed their last names while walking away.

23. I was surprised to learn at that time and thereafter that almost everyone in the building learned about the incident with the false claims made by those security officers that I was acting disorderly, was cursing, and was breaching the peace.

24. Thereafter, I sought to obtain names and contact information of eyewitnesses. It was at that time that a heavy set middle-aged Black man and his female companion (that I saw at the Traffic Adjudication Office during my second visit there that day) informed me that they heard of that incident of assault and false claims of disorderly conduct about me and recommended with persistence that I immediately called 911 and request also an ambulance so as to have everything properly documented.

25. I followed their advice by calling 911.

26. I sustained physical, mental, and emotional harms as a result of these assaults in various areas of my body, including but not limited to the top of my head, my ankles, knees, arms, right and left sides, and my back.

27. MPD arrived on the scene. Ambulance also arrived on the scene to provide emergency care.

**Exhibit 5**

# .Law Offices of Gerard Djate

2330 Good Hope Rd SE, Suite 1222
2300 M Street NW, Suite 800
Washington, DC 20020
Tel : (202) 973-8139
Fax: (202) 423-2132
gdjate@tmail.com
www.djatelaw.org

**VIA HAND-DELIVERY:**
Metropolitan Police Department
Headquarters
300 Indiana Avenue NW
Washington, DC 20001

Attn: Charles Ramsey, Chief of Police

RE: **Law Enforcement brutality & Assault**
      **CCN: 009094**
      Victim:            Gerard A. Djate
      Date:             January 21, 2006
      Assaulting Security Officers:
                          Tim Delyons
                          Dante Slade
      Place:    300 Indiana Avenue NW

Dear Chief Ramsey:

    Greetings! This is to apprise you of a serious incident of law enforcement's abuse, brutality, and assault that took place right under your office last week. Please see the attached Statement of Gerard Djate on Assault Events. After I received and read the Police Report, I am nothing but more appalled at its contents and form that I find seriously irresponsible and lacking in light of the fact that MPD Police was summoned to the scene of the incident by myself just minutes after its occurrence. More appalling was the fact that a certain witness indicated having heard one of the MPD officers whispering "this looks like a scam to me" simply because I happen to be an attorney. It now appears that the victim is now being branded the accused.

    I was informed by your agency that these incidents of assault and police brutality should be caught on the recording surveillance cameras located at the place of occurrence. Therefore, I requested that these be properly secured to



# Law Offices of Gerard Djate

2330 Good Hope Rd SE, Suite 1222
2300 M Street NW, Suite 800
Washington, DC 20020
Tel : (202) 973-8139
Fax: (202) 423-2132
gdjate@tmail.com
www.djatelaw.org

Chief Charles Ramsey
January 25, 2006
Page 2

substantiate my version of the facts of these unfortunate events.

However, as of today, I have not yet received any updates or words whatsoever on the status of this occurrence notwithstanding the fact that I called at least twice and visited once the 1rst District of the MPD supposedly handling this serious and sensitive matter. Meanwhile, these irresponsible assaulting officers are still posing a serious risk of harms to other customers visiting the DMV and the Traffic Adjudication Office located under your office.

I would greatly appreciate if you would give an attention to this matter at your earliest convenience

DATED:  January 25, 2006

Very truly yours,

Gerard Djate

Cc:    Office of the Mayor

GD/lea



**SENDER:** COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Chief of Police
Chief Charles Ramsey
300 Indiana Ave NW
   5th floor
Wash, DC 20001

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
2-3-06

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)
7005 0390 0001 1330 8394

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Gerard Djate, Esq
2330 Good Hope Rd SE
   Suite 1722
Washington, DC 20020

10+4124    C007    |..|.|||.|..|.||||..|.|.||.|.|.|.|.|.|.||










**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GERARD DJATE** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) **1:07CV00100 (EGS)** |
| | ) |
| **v.** | ) **Judge E.G. Sullivan** |
| | ) |
| **THE DISTRICT OF COLUMBIA, et al.** | ) |
| | ) |
| **Defendants.** | ) |

## <u>ORDER</u>

Upon consideration of the Defendant District of Columbia's First Amended Motion to Dismiss and/or Motion for Summary Judgment's, Plaintiff's Opposition thereto, the supporting memorandums of points and authorities, and the complete record in this case, it is by the Court this ___day of _____2007,

ORDERED that the Defendant District of Columbia's First Amended Motion to Dismiss and/or Motion for Summary Judgment be, and hereby is DENIED for the reasons set forth in Plaintiff's Opposition, and it is,

FURTHER ORDERED that:

_____
Judge,
United States District Court for the District
Of Columbia

14